**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOAN JAFFE,<br><br>*Plaintiff,*<br><br>v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, CAPGEMINI AMERICA, INC., and CHCS SERVICES, INC.,<br><br>*Defendants.* | Civil Action No. 19-18067 (KSH) (CF)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

In October 2018, at 78 years old and ailing, Joan Jaffe made a claim for coverage under the long-term-care insurance policy she purchased from The Progressive Insurance Company of America in 2003. If approved in the ordinary course, she would start receiving benefits on December 22, 2018. Over the span of the next nine-and-a-half months, Prudential denied her claim and subsequent appeal. In November 2020, Jaffe tried again. This time her claim was approved, and benefit payments began on January 2, 2021. But two-and-a-half years later, on June 5, 2023, Prudential terminated benefits, having determined that Jaffe no longer met the policy's criteria. Jaffe appealed again, this time successfully, securing as of May 7, 2024, back-payments with interest and a refund of premiums. She continues to receive policy benefits today. Functionally, then, Jaffe was refused benefits from December 22, 2018, through January 2, 2021, and has received benefits under the policy since that date, although the eleven-month period

from June 5, 2023, through May 7, 2024, was a period of no payments and uncertainty about the future.

Jaffe has sued Prudential and its third-party administrator, claiming damages for what Jaffe argues is a broad course of conduct from at least 2018 through 2024 full of contract breaches, bad faith, unreasonable business practices, and conspiracy. Jaffe seeks recovery of denied benefits under the insurance contract as well as tort and statutory damages arising from the processing of her claims and appeals.

Jaffe presses seven causes of action against Prudential: breach of contract for refusal of benefits (Count One) and waiver of premiums (Count Two), bad faith delay and denial of her benefits under the common law (Count Four) and a Colorado statute (Count Five), violation of the Colorado Consumer Protection Act (Count Six), and civil conspiracy (Count Seven). In Counts Four, Five, and Seven, Jaffe also names Prudential's third-party administrator, Capgemini America, Inc., and CHCS Services, Inc. (collectively, "the CHCS Defendants"),[1] as defendants. Jaffe also seeks declaratory judgment (Count Three) for various rights under the policy.

Before the Court are a motion for partial summary judgment from Prudential and a motion for summary judgment from the CHCS Defendants. Prudential leaves Counts One and Two undisturbed but seeks to narrow the case through an award of summary judgment on the remaining five counts. The CHCS Defendants seek summary judgment on all three counts that name them.

For the reasons discussed below, the Court grants in part and denies in part Prudential's motion. The Court denies the CHCS Defendants' motion in full.

---

[1] The Court adopts this naming convention from Capgemini and CHCS, who have filed a single summary judgment motion treating themselves as a unified party. *See* (D.E. 247 1.)

## II. Factual Background

### A. Jaffe's Long-Term Care Policy with Prudential and the CHCS Defendants

In 1979, Jaffe moved from New York to Colorado with her husband and family. (D.E. 223, Second Amended Complaint ("SAC") ¶ 23.) Soon thereafter, the Jaffes' youngest child was struck by lightning, rendering her incapacitated and in need of around-the-clock care. (*Id.* ¶ 26.) The Jaffes took on the caregiving role themselves. (*Id.* ¶ 27.) After providing this care for six years, Jaffe "realized that if she were to need long term care, her husband and/or her family would be unable to provide such support, which led her to seek long-term care insurance for herself so that there would be funds to hire caregivers." (*Id.* ¶ 28.)

Accordingly, on February 13, 2003, Jaffe, then a Colorado resident for nearly a quarter century, bought an individual Long-Term Care ("LTC") insurance policy from a Prudential agent. (SAC ¶¶ 11, 29; D.E. 1-1, the "Policy," at ECF 3.) Under the Policy, Jaffe would be paid up to $350 per day in benefits (subject to a 5% simple interest annual increase on the policy anniversary date)[2] if she experienced "a loss of the ability to perform, without Substantial Assistance, at least two Activities of Daily Living ["ADLs"] for a period of at least 90 consecutive days; or . . . [a] severe Cognitive Impairment which requires Substantial Supervision to protect [her] from threats to health and safety." (Policy at 11, 4.) The Policy defines ADLs as "Bathing, Continence, Dressing, Eating, Toileting, and Transferring." (*Id.* at 9.) "Substantial Assistance" is defined as "1) [t]he physical assistance of another person without which you would not be able to perform an Activity of Daily Living; or 2) [t]he constant presence of

[2] Unclarity exists in the record regarding the amount of benefits initially available to Jaffe under the Policy. The parties appear to agree that Jaffe's initial benefit was $200 per day. (SAC 31–32; D.E. 245-1 ¶ 2; D.E. 247-1 ¶ 6.) But the version of the Policy in the record indicates that the benefit for "all Home Health Care" is "Up to $350" (D.E. 1-1 at ECF 3), and Prudential has submitted a chart (in the same document identifying the initial daily benefit at $200) indicating that benefits available for year one of the Policy were $350 (D.E. 245-1 ¶ 12).

another person within arm's reach that is necessary to prevent, by physical intervention, injury to you while you are performing an Activity of Daily Living." (*Id.* at 6.) Premiums on the policy would be waived beginning the month after benefits were payable. (*Id.* at 14.)

In June 2016, Prudential contracted with Capgemini to administer Prudential's Individual Long-Term Care policies. (D.E. 247-1, CHCS Statement of Material Facts ("CHCS SMF") ¶ 10). Capgemini, in turn, used CHCS to administer the policies. (*Id.* ¶ 11.)[3] The CHCS Defendants were responsible for assessment of claims for benefits, appeals from denials of benefits, eligibility evaluations, and reassessments. (*Id.* ¶¶ 10–11.)

Jaffe has resided in other states during the life of the Policy. In 2009, she moved from Colorado to California, where she lived until 2017, when she and her husband moved to a rental home in New Hampshire to be closer to a grandson who was playing college football for Dartmouth. (D.E. 252 at 2.) She moved to Vermont in 2021 and relocated in 2025 to California, where she currently resides in an assisted-living facility. (*Id.*; D.E. 252-55 at 10-18–11-11.)

### B. The 2018 Claim and Denial

On October 23, 2018, while living in New Hampshire, Jaffe submitted a claim for benefits under the Policy. (D.E. 245-1, Prudential Statement of Material Facts ("Pru. SMF") ¶ 9.)[4] The claim reported a diagnosis of spinal stenosis, scoliosis, knee problems, a history of incontinence, and difficulty with the ADLs of bathing and transferring. (D.E. 252-1, Jaffe Responses to Pru. SMF and Jaffe Supplemental Statement of Material Facts ("J. SSMF") ¶ 1;

[3] According to Prudential, the CHCS Defendants serve "as Prudential's agent in the form of a third-party administrator of LTC eligibility determination and administration, claims and appeal handling/processing, etc… [*sic*] pursuant to the October 11, 2015 Master Services Agreement between Prudential and IGate Technologies Inc., [the] CHCS [Defendants'] predecessor in interest." (Pru. SMF ¶ 3.)

[4] Here and throughout, the only facts taken from Prudential's or the CHCS Defendants' Rule 56.1 statements of material facts are those with which Jaffe does not disagree in her responses. (*See* D.E. 252-1, 253-1.)

D.E. 261, Prudential Responses to J. SSMF ¶ 1.) Pursuant to the Policy's requirement as a prerequisite to coverage, the CHCS Defendants arranged for an in-home assessment of Jaffe on December 2, 2018, by Nina Kamman, a registered nurse and therefore a "Licensed Health Care Practitioner" ("LHP") under the Policy. (Pru. SMF ¶¶ 12–13; CHCS SMF ¶ 25; Policy at 5.) Nurse Kamman performed her assessment with the guidance of a Comprehensive Assessment ("BEA") form prepared by defendants. (D.E. 245-3 at 49–66; J. SSMF ¶ 2.) During Nurse Kamman's assessment, Jaffe demonstrated her relative ability or difficulty performing ADLs. (CHCS SMF ¶ 27; Pru. SMF ¶¶ 15–21.) Nurse Kamman concluded that Jaffe could perform the ADLs of walking, transferring, dressing, continence, toileting, eating, with no assistance or the use of a cane, but required hands-on assistance of another person for bathing. (D.E. 245-3 at 55–57; Pru. SMF ¶ 14.) Nurse Kamman also noted that Jaffe was completely unable to shop, prepare food, keep house, or do laundry on her own. (D.E. 245-3 at 58.)

By a letter dated December 26, 2018, Prudential denied Jaffe's claim "because she could not be certified as chronically ill." (D.E. 245-3 at 194–95; Pru. SMF ¶ 27.) Jaffe responded on February 26, 2019, by means of a letter titled "NOTICE OF APPEAL" accompanied by personal statements from herself and her husband, and records from Eric Campbell, a Doctor of Physical Therapy who had been treating Jaffe since January 2018. (D.E. 245-3 at 218–22; Pru. SMF ¶ 30; J. SSMF ¶ 7.)[5] On February 28, 2019, Prudential informed Jaffe that it considered her letter to be notice of intent to appeal and requested "medical records from the insured's physician that

[5] The parties dispute whether this letter constituted an appeal or notification of intent to appeal. (Pru. SMF ¶ 30) ("By correspondence received February 27, 2019, Plaintiff wrote Defendants notifying them of her intent to appeal . . ."); (CHCS SMF ¶ 32) ("On February 26, 2019, Plaintiff submitted a written appeal . . ."); (J. SSMF ¶ 7) ("By correspondence received February 12, 2019, Plaintiff appealed . . . .") The opening line of Jaffe's cover letter is "Joan Jaffe ('Joan') hereby appeals from the denial of her eligibility for benefits . . ." (D.E. 245-3 at 218.) Prudential maintains that the letter constitutes an "intent to appeal" and not an appeal "[b]ecause it did not come in with objective medical records." (D.E. 245-3 at 119-8–120-4.)

can validate the insured's need with at least 2 [ADLs] . . . for at least 90 consecutive days." (D.E. 245-3 at 234; Pru. SMF ¶ 31; J. SSMF ¶ 8.)

On March 22, 2019, Jaffe sent updated correspondence that included a letter from her primary care physician, Dr. Rebecca Crow. (D.E. 245-3 at 238; Pru. SMF ¶ 32; J. SSMF ¶ 9.) Dr. Crow acknowledged that Jaffe had been a patient under her care since 2017 and stated:

> From my review of Joan's medical history and clinical observation and those documented by physical therapist Eric Campbell, I can attest that Joan has difficult[y] moving from place to place outside her home especially during the winter months requiring cane or wheelchair with assistance required from another person for at least the last 6 months. In addition to her spinal stenosis and osteoarthritis in her knees, Joan's balance is unsteady and makes it difficult to transition from uneven terrain or stairs without assistance. Joan also requires substantial assistance with dressing particularly putting on pants and shoes. The side of her tub is 20" high and she needs substantial assistance to safely get in and out when showering for the last 6 months at least.

(D.E. 245-3 at 238.) Jaffe argued that in addition to the ADL of bathing that Nurse Kamman already identified as requiring substantial assistance, the evidence also supported her need for substantial assistance with the ADLs of transferring, continence, and dressing. (*Id.* at 239–41.)

In response, defendants wrote to Jaffe on March 27, 2019, requesting nine months of medical records from Dr. Crow that would validate the need for assistance with at least two ADLs or a Severe Cognitive Impairment. (D.E. 245-3 at 245; Pru. SMF ¶ 34.)[6] Jaffe responded by insisting that "Prudential already has what it requires" to validate her claim. (D.E. 245-3 at 247; Pru. SMF ¶ 35.) Prudential acknowledged receipt of Jaffe's response, still noting that it had not received the requested records. (D.E. 245-3 at 250; Pru. SMF ¶ 36.)

At this point, Jaffe hired lawyers as she prepared her response. On April 30, 2019, she alerted defendants that all future communications concerning the present coverage dispute should be directed to the "Garden City office" of law firm of Schwartz, Conroy & Hack, PC.

[6] The name on the letter's return address, which is in Florida, is "The Prudential Insurance Company of America, As Administered by CHCS." (D.E. 245-3 at 245.)

(D.E. 253-17 at 2–3; Pru. SMF ¶ 37.) The letter included the Garden City address in its header and footer. (D.E. 253-17 at 2–3.) On June 10, 2019, Jaffe's lawyers (who continue to represent her to this day) sent Prudential correspondence enclosing documents in support of her appeal, including statements from Jaffe and her husband, forty-four months of physical therapy records, and a narrative letter from Dr. Crow, as well as medical records from Dr. Crow, Dr. Abdullah Kandil, M.D., Deborah Brown, A.P.R.N., and a walk-in clinic. (D.E. 245-3 at 254–396; Pru. SMF ¶ 38; J. SSMF ¶ 17.)

About one month later, on July 12, 2019, Jaffe's attorneys wrote to Prudential asserting that its lack of communication regarding Jaffe's appeal put the insurer out of compliance with the Policy terms and demanding "immediate attention to this matter, in accordance with the procedures set forth in the Policy." (D.E. 245-3 at 400–01; Pru. SMF ¶ 40; J. SSMF ¶ 15.)

Prudential denied Jaffe's appeal on August 1, 2019. (D.E. 245-3 at 403–04; Pru. SMF ¶ 44.) Jaffe filed this lawsuit on September 17, 2019. (D.E. 1; Pru. SMF ¶ 45.)

### C. The 2020 Claim, Termination, and Successful Appeal

On November 30, 2020, after she had filed suit, Jaffe made a new claim under the Policy, offering the support of an in-person assessment performed by Dr. Bradley Cash, M.D., which concluded that Jaffe was now in need of substantial support in all six ADLs. (D.E. 245-3 at 410–19; Pru. SMF ¶¶ 51–53.) On March 25, 2021, Prudential approved Jaffe's claim, retroactive to November 3, 2020, the date of Dr. Cash's report, and began paying benefits on January 2, 2021, after a required 60-day waiting period. (D.E. 247-3 at 288–89; Pru. SMF ¶¶ 54–55; Policy at ECF 3.)

IRS regulations required Jaffe to undergo annual reassessment to continue receiving LTC benefits. (Policy at 9; Pru. SMF ¶ 58.) By letter dated December 19, 2022, Prudential wrote to

Jaffe in care of her lawyers' Manhattan address (not the firm's Garden City address) stating that a reassessment was necessary. (D.E. 245-3 at 421; Pru. SMF ¶ 61.) Prudential sent correspondence to the same Manhattan address on January 13, 2023, and January 20, 2023. (D.E. 245-3 at 422–24.) Before that, on January 6, 2023, Prudential wrote directly to Dr. Patrick Francis, M.D., telling him that he had been "named as a care provider" in Jaffe's claim and requesting that he complete an attached "Physician ADL/Cognitive Impairment Questionnaire" ("PAQ") to certify Jaffe's level of independence with respect to each ADL. (*Id.* at 426–31; Pru. SMF ¶ 63.) Responding to Prudential's request, Dr. Francis checked boxes marking Jaffe as "Independent" in all six ADLs. (D.E. 245-3 at 433–36.) Dr. Francis did not examine Jaffe with a view to the ADLs at any time after receiving Prudential's letter, but rather relied on his impressions from an exam of her on December 19, 2022, which had been focused on atrial fibrillation, knee pain, iron deficiency, and depression. (*Id.* at 443.) Relying exclusively on Dr. Francis's assessment, Prudential terminated Jaffe's benefits by letter dated June 5, 2023. (*Id.* at 463–64.)

By letter dated August 4, 2023, Jaffe again either appealed her denial or submitted an intent to do so. (D.E. 253-33 at 4) ("This correspondence and its attachments constitute Ms. Jaffe's internal appeal from Prudential Insurance Company of America's June 5, 2023 denial of her claim . . . .); (Pru. SMF ¶ 71) ("On August 4, 2023, [Jaffe] submitted her intent to appeal . . .); (CHCS SMF ¶ 50) ("On August 4, 2023, [Jaffe] indicated she intended to appeal . . .); (J. SSMF ¶ 51) ("On August 4, 2023, Ms. Jaffe appealed . . . .) Enclosed with the five-page cover letter were three assessments by Dr. Cash (one each from 2020, 2022, and 2023), physical therapy notes, excerpts from a deposition of Dr. Francis, and Dr. Francis's completed PAQ. (D.E. 253-33 at 4–56; J. SSMF ¶ 51.) On August 28, 2023, Jaffe's lawyers wrote to Prudential

again insisting that Prudential was not abiding by its own timing procedures for responding to appeals. (D.E. 253-34 at 2.) By letter dated September 12, 2023, Prudential acknowledged Jaffe's letter (calling it her "intention to appeal"), stated that it had "not received any new objective medical documentation for consideration as part of the appeal," and requested that Jaffe undergo an "Independent Medical Examination." (D.E. 245-3 at 466–67.) Jaffe's lawyers wrote back on September 26, 2023, demanding immediate payment of benefits retroactive to June 5, 2023, and accusing Prudential of acting in bad faith by, *inter alia*, requiring an Independent Medical Examination. (D.E. 252-35 at 1–5.)

On May 7, 2024, defendants certified Jaffe as chronically ill, retroactive to June 5, 2023, granted her appeal, paid her back-benefits with interest, and reimbursed her for premiums. (D.E. 253-10 at 2–3; Pru. SMF ¶ 75–76; SAC ¶ 139.)

## III. Procedural History

Jaffe filed the instant lawsuit on September 17, 2019, based on diversity jurisdiction (D.E. 1), and filed the operative SAC on July 25, 2025. (D.E. 223.) The SAC alleges breach of contract against Prudential (Count One) for withholding payment of benefits from December 2018 through January 2021; alleges a second count of breach of contract against Prudential (Count Two) for collecting nearly $13,000 in premiums during the time Jaffe claims entitlement to benefits and the attendant fee waiver that the Policy requires; demands a declaratory judgment (Count Three) that (1) Jaffe has a chronic illness or disability as the Policy defines those terms, (2) Prudential is obligated to pay Policy benefits "from December 23, 2018 onward for as long as she has a Chronic Illness or Disability as set forth in the Policy," (3) premiums are waived as of January 1, 2019 and for as long as she qualifies for benefits, and (4) she may return to the Court to seek further relief if necessary; alleges a common-law breach of the covenant of good faith

and fair dealing against Prudential and the CHCS Defendants (Count Four) for a bad-faith delay and denial of insurance benefits; alleges violation of Colorado Revised Statutes ("C.R.S.") §§ 10-3-1115 and 10-3-1116 by Prudential and the CHCS Defendants (Count Five) for unreasonable delay or denial of her claims; alleges a violation of the Colorado Consumer Protection Act ("CCPA") by Prudential (Count Six) for, *inter alia*, advertising, selling, and managing the Policy deceptively; and alleges civil conspiracy against Prudential and the CHCS Defendants (Count Seven) for conspiring to delay and deny her benefits unjustly. (SAC ¶¶ 144–89.)

## IV. Standard of Review

Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and material if the evidence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially, the moving party bears the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the nonmovant bears the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant satisfies its initial burden, the nonmovant must identify specific record evidence establishing a genuine dispute for trial; it may not rest on the allegations or denials in its pleadings. *Anderson*, 477 U.S. at 248, 256; Fed. R. Civ. P. 56(c)(1). This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). The nonmoving party may rely on "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," so long as the facts presented can be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1)(A), (c)(2); *Celotex Corp.*, 477 U.S. at 324. "Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (citation omitted).

At the summary judgment stage, the Court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)). The Court may not, however, resolve credibility disputes or weigh the evidence. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425, 428–29 (3d Cir. 2013). "[I]nstead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in its favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## V. Discussion

### A. Count Three: Jaffe's Demand for Declaratory Relief

In her third cause of action, Jaffe seeks declaratory judgment that (1) "she had and still has a Chronic Illness or Disability pursuant to the language and within the meaning of the Policy"; (2) Prudential is obligated to pay her benefits "from December 23, 2018 onward for as long as she has a Chronic Illness or Disability as set forth in the Policy"; (3) her "premiums are waived commencing January 1, 2019 and for as long as she has a Chronic Illness or Disability as

set forth in the Policy"; and (4) "she may return to this [C]ourt, upon motion, to seek further relief in the event it becomes necessary." (SAC ¶¶ 156–59.)

Although Jaffe relies on Colorado's declaratory judgment statute, C.R.S. § 13-51-106 (*id.* ¶ 155), Prudential is correct (D.E. 245 at 32 n.14) that the proper vehicle for Jaffe's demand in federal court is the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a). The DJA provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). "Where an actual controversy exists, the DJA 'place[s] a remedial arrow in the district court's quiver and confers a unique and substantial discretion on federal courts to determine whether to declare litigants' rights.'" *Great Lakes Ins. SE v. Ross*, 652 F. Supp. 3d 472, 478–79 (D.N.J. 2023) (quoting *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 139 (3d Cir. 2014)). The DJA evinces a "textual commitment to discretion" which authorizes district courts "in the sound exercise of [their] discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close." *Reifer*, 751 F.3d at 139 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–88 (1995)).

Prudential's primary argument is that Count Three cannot survive because "an order requiring payment of past benefits[] is identical to the breach of contract claim." (D.E. 245 at 33.)[7] At the present summary judgment stage, therefore, the Court must ask whether Prudential has demonstrated from evidence in the record that resolution of the contract claim would fully

[7] The CHCS Defendants take no position on Count Three.

and necessarily resolve the parties' identified rights under the Policy, leaving behind no live controversy for declaratory relief. But Prudential hasn't. Instead, it fashions its summary judgment argument as though it were making a motion to dismiss and argues that "the Third Count should be dismissed with prejudice" (*id.* at 33–34), relying on several cases (which themselves cite to a host of others) that dismiss declaratory claims as duplicative *at the pleading stage*. Prudential never made a motion to dismiss this claim, and the Court will not revisit the sufficiency of the pleading. Right now, there is no question that material facts in the record regarding Jaffe's eligibility for benefits from October 23, 2018, through January 2, 2021, remain disputed.

The Court finds that Prudential is not entitled to summary judgment as to Jaffe's requests for declarations regarding her medical conditions, Prudential's obligation to pay benefits, and premium waiver in the time period from October 23, 2018, through January 2, 2021. Summary judgment is denied as to those requests in that time period.

The parties do not dispute, however, that material record evidence demonstrates that Jaffe has been entitled to benefits from January 2, 2021, through the present. (Pru. SMF ¶ 55; J. SSMF Response to ¶ 55.) The Policy makes future benefit payment and premium waiver contingent on Jaffe's continuing satisfaction of specified eligibility conditions. (Policy at 9.) Those conditions cannot be resolved on the present record because they depend on future facts and claim administration. Summary judgment is therefore awarded to Prudential on Jaffe's request for declarations construing the Policy (SAC ¶¶ 156–58) as to any period after January 2, 2021.

Summary judgment in Prudential's favor is also granted on Jaffe's request for a declaration that she may return to the Court upon motion to seek further relief. (SAC ¶ 159.)

Like any litigant, Jaffe may file motions and seek relief in the ordinary course, subject to the Federal Rules, applicable law, and any case-management or final-judgment limitations that may be in place. A declaration that Jaffe may someday seek unspecified relief if it later becomes "necessary" would neither resolve an existing controversy nor define any legal relation between the parties. The request therefore seeks an advisory opinion concerning hypothetical future circumstances, rather than a conclusive adjudication of a present dispute concerning the parties' legal relations, and must be denied. *See Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 240–41 (1937) (holding that a court may not use the DJA to issue "an opinion advising what the law would be upon a hypothetical state of facts"); *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (citing *Haworth* for the proposition that declaratory judgment may not constitute an advisory opinion).

### B. Count Four: Bad-Faith Breach of the Covenant of Good Faith and Fair Dealing by Prudential and the CHCS Defendants

In her fourth cause of action, Jaffe alleges a bad-faith breach of the covenant of good faith and fair dealing against Prudential and the CHCS Defendants. (SAC ¶¶ 160–69.) She demands extra-contractual damages "for physical suffering, emotional distress, humiliation, inconvenience and anxiety." (*Id.* ¶ 189(c).) [8] Jaffe situates Count Four—and each cause of action—within Colorado law "[a]s a result of the Policy being sold and executed in Colorado." (SC ¶ 12.) According to Prudential, "New Hampshire, and not Colorado law, applies to this

[8] Along with these tort remedies, Jaffe's prayer for relief demands "[o]n the Fourth Cause of Action, an award of two times the damages due Plaintiff pursuant to C.R.S. § 10-3-1116." (SAC ¶ 189(d).) The two-times multiplier is a remedy that the Colorado legislature created for violations of the statute prohibiting unreasonable delay or denial of insurance benefits, not for the common-law tort alleged in Count Four. *See* C.R.S. § 10-3-1116(1). Moreover, the remedy is limited to two times the covered benefit, not two times a plaintiff's damages. *Id.* The statutory remedy is therefore available only on Jaffe's fifth cause of action and not the fourth.

action as New Hampshire is undeniably more closely related to [Jaffe's] bad faith claim and delay claims." (D.E. 245 at 12.) As to choice-of-law, the CHCS Defendants adopt Prudential's argument. (D.E. 247 at 13.) Before assessing the merits of Count Four, therefore, the Court must resolve the apparent conflict of law.

A federal court sitting in diversity applies the choice-of-law rules of the forum state to determine controlling law. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Maniscalco v. Brother Int'l (USA)*, 709 F.3d 202, 206 (3d Cir. 2013). New Jersey applies the "most significant relationship" test established in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 142–43 (2008). Courts are to apply this test "on an issue-by-issue basis," assessing the factors on a qualitative rather than a quantitative basis. *Id.* at 143.

The test proceeds in two parts. First the court determines whether an actual conflict exists "by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *Id.* (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006)). Absent an actual conflict, "there is no choice-of-law issue to be resolved." *Id.*

If an actual conflict exists, the court resolves which jurisdiction's law controls by determining which jurisdiction has the "most significant relationship to the parties or issues." *Id.* at 143. The Restatement suggests that courts resolving conflicts of tort law should first consider:

(a) the place where the injury occurred;
(b) the place where the conduct causing the injury occurred;
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (Am. L. Inst. 1971); *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 267 (3d Cir. 2000). These contacts provide

guidance "in applying the principles of [Restatement (Second) of Conflict of Laws] § 6 to determine the law applicable to an issue." Restatement (Second) of Conflict of Laws § 145(2).

Section 6, in turn, lists the following seven "factors relevant to the choice of the applicable rule of law":

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2); *Camp Jaycee*, 197 N.J. at 140. "For purposes of an issue arising out of tort law, those factors may be grouped into five categories of interest: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Fu v. Fu*, 160 N.J. 108, 122 (1999); *see also Camp Jaycee*, 197 N.J. at 147 (characterizing this same list as "the section 6 principles" "[r]educed to their essence").

Here, step one of the choice-of-law analysis reveals that an actual conflict exists because Jaffe's tort claim and the attendant demand for extra-contractual damages are cognizable under Colorado law and not New Hampshire law.

In Colorado, "[b]ecause of 'the special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of [the duty of good faith and fair dealing] gives rise to a separate cause of action sounding in tort." *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003) (contrasting insurance contracts to commercial contracts, for which a breach of the implied covenant results in damages only for

breach of contract) (quoting *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo. 1984). Colorado law does not "limit[] the categories of damages available in bad faith breach of insurance contract claims" but rather permits recovery for "traditional tort principles, which includes non-economic injuries such as emotional distress." *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 416–17 (Colo. 2004).

New Hampshire, by contrast, does not recognize a cause of action sounding in tort for bad-faith denial of first-party health insurance benefits. *Jarvis v. Prudential Ins. Co. of America*, 122 N.H. 648, 650 (1982); *see also Bell v. Liberty Mut. Ins. Co.*, 146 N.H. 190, 194 (2001) (relying on *Jarvis* to deny tort damages "[i]n an action for breach of an insurer's duty to settle a first-party claim"). As a result, a plaintiff is limited to "damages *ex contractu*," which may extend to "specific consequential damages," but only in the event that the insured "can prove that such damages were reasonably foreseeable by the insurance company and that [the insured] could not have reasonably avoided or mitigated such damages." *Jarvis*, 122 N.H. at 650, 654; *see also Dev. Fin. Corp. v. Chi. Title Ins. Co.*, 2012 WL 5412506, at *3 (D.N.H. Nov. 6, 2012) ("As *Jarvis* makes clear, the proper vehicle for a policyholder to use when seeking to recover from an insurer that has wrongfully failed to pay a claim is an action against the insurer for breach of contract.").

Satisfied that a conflict of law exists, the Court moves on to determine which state has the most significant relationship to the issue under the Section 6 principles by first considering the contacts enumerated in the § 145(2).[9]

---

[9] Contrary to Prudential's position, the Court need not apply the presumption in Restatement (Second) of Conflict of Laws § 146 in favor of "the local law of the state where the injury occurred." (*See* D.E. 245 at 13–14.) Section 146 is limited to "an action for a personal injury" and does not extend to a claim for bad-faith breach of an insurance contract. Restatement (Second) of Conflict of Laws § 146.

The first contact is the place where the injury occurred. Prudential insists "there can be no dispute that any alleged injury occurred in New Hampshire . . . because this is where [Jaffe] resided when she was allegedly improperly examined, when her 2018 claim was denied, and when her appeal of that claim was denied." (D.E. 245 at 14–15, 16.) Jaffe argues that this contact "is split between jurisdictions, as [she] resided in New Hampshire during the initial period of bad faith conduct (2018–2019) and in Vermont during the subsequent period (2022–2024)."[10] (D.E. 252 at 25.)

Historically and generally in tort cases, the "place of injury" is "the place where the last act giving rise to a claim occurred." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 903 n.11 (2011) (Ginsburg, J., dissenting) (citations omitted). That is a straightforward analysis when a discrete event, act, or omission underlies the issue. Here, however, when treating all of Jaffe's claims as true for the purposes of summary judgment, one of any number of acts could have given rise to a claim for bad faith. While Jaffe lived in New Hampshire, defendants denied her initial claim on December 26, 2018, more than two months after she requested benefits. They allegedly slow-walked her appeal over the course of more than eight months, finally issuing a denial of the appeal on August 1, 2019. Jaffe alleges that Prudential acted in bad faith after she moved to Vermont by knowingly sending legal correspondence to an outdated address, selectively crediting one examining physician's report over another, pretextually terminating her benefits, failing to give reasonable consideration to or reasonably process her appeal, and insisting on a third medical examination before restoring her benefits with retroactive payments and other considerations.

[10] Prudential is wrong that "[Jaffe] never mentions this crucial factor." (D.E. 260 at 6.) She does so in the passage quoted and cited above. As such, the Court rejects Prudential's argument that "[t]his omission suggests [Jaffe] understands that this key element was so against her, that no argument could be compelling." (*Id.*).

The place where the injury occurred may therefore be either New Hampshire or Vermont, and does not establish contact with Colorado. Still, this contact only "plays an important role in the selection of the state of the applicable law" when "the injury occurred in a single, clearly ascertainable, state." Restatement (Second) of Conflict of Laws §145 cmt. (e). In other instances, "the place of injury will not play an important role in the selection of the state of the applicable law" such as, for example, "when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue . . . or when . . . injury has occurred in two or more states." Restatement (Second) of Conflict of Laws § 145(2) cmt. (e).[11] Here, the alleged course of Prudential's bad faith caused injury in at least two states, not in a single, clearly ascertainable, state. As such, this contact bears little weight in the choice-of-law analysis.

The Court must next consider the place where the conduct causing the injury occurred. Prudential argues that this contact points to New Hampshire because Jaffe's claim originated there, it was where her allegedly bad faith examination occurred, and where she received correspondence denying her claim and appeal. (D.E. 245 at 16.) Prudential adds that the CHCS Defendants evaluated Jaffe's claim from workplaces in Pennsylvania and Florida. (*Id.*) Jaffe insists that this contact "is not clearly identifiable" because "[t]he alleged conduct could have occurred in any jurisdiction where relevant Prudential personnel were located at the time." (D.E. 252 at 25.)

[11] For these reasons, the unpublished and/or out-of-district cases on which Prudential relies to establish New Hampshire as the place of injury are distinguishable. Three of the cases involved damage to physical property, *Bridgewater Wholesalers, Inc. v. Pa. Lumbermens Mut. Ins.*, 2015 WL 3448120, at *1 (D.N.J. May 29, 2015), *Weitz Co. LLC v. Lloyd's of London*, 2010 WL 11507729, at *3 (S.D. Iowa Dec. 20, 2010), and *Kilmer v. Conn. Indem. Co.*, 189 F. Supp. 2d 237, 239–40 (M.D. Pa. 2002); and two involved car collisions, *Barten v. State Farm Mut. Auto. Ins. Co.*, 28 F. Supp. 3d 978, 983 (D. Ariz. 2014), *Davis v. Geico Gen. Ins. Co.*, 957 F. Supp. 2d 544, 546 (M.D. Pa. 2013). Property damage and car collisions are discrete events easily located in time and space. They are uninstructive in an analysis of an alleged bad faith course of conduct arising at least from two separate claims originating in two separate jurisdictions based on a contract signed in yet a third jurisdiction.

As above, the lack of a specific act or omission complicates the analysis and diminishes the significance of this contact. As the Restatement recognizes, "[c]hoice of the applicable law becomes more difficult in situations where the defendant's conduct and the resulting injury occurred in different states." Restatement (Second) of Conflict of Laws §145(2) cmt. (e). This difficulty only grows as more states enter the analysis. Here, this contact offers little guidance in choosing applicable law because the alleged bad-faith conduct may have occurred in any combination of New Hampshire, Vermont, Florida, and Pennsylvania.

The next contact is the domicile, residence, nationality, place of incorporation and place of business of the parties. Prudential, while acknowledging that it and the CHCS Defendants are variously domiciled in New Jersey, New York, and Florida, links this contact to New Hampshire because Prudential conducts business there and "individuals insured under their policies, such as [Jaffe] reside in New Hampshire." (D.E. 245 at 16–17.) Jaffe finds in this contact further support for choosing Colorado law because "Prudential indisputably conducted, and continues to conduct, business in Colorado." (D.E. 252 at 24–25.)

According to the Restatement, this contact enumerates "places of enduring relationship to the parties." Restatement (Second) of Conflict of Laws §145(2) cmt. (e). "[T]he importance of these contacts depends largely upon the extent to which they are grouped with other contacts." *Id.* Here, the diffuse nature of the action frustrates grouping these contacts. For example, Jaffe certainly resided in New Hampshire in 2018, but she moved there only to be close to a grandson during his college football career. This does not demonstrate an intention to remain or history of remaining in New Hampshire indefinitely, making it difficult to treat the state as her domicile. Moreover, although it is reasonable to treat Vermont as Jaffe's domicile and residence as of 2021, doing so only clouds the contacts analysis because the alleged bad-faith conduct stretched from

2018 through 2024. Jaffe has since moved to California, where she continues to hold and receive benefits from the Policy. On the other side of the ledger, Prudential's Delaware incorporation and New Jersey principal place of business do little to clarify matters. The fact that Prudential conducts business in many states makes that factor negligible to discerning a place of enduring relationship. As with the previous contacts, this factor offers little insight and must carry little weight.

The final Section 145 contact is the place where the relationship between the parties is centered. Prudential insists, "the relationship between the parties is centered in New Hampshire because [Jaffe] resided there, was insured there, made her initial claim there, was examined in person there, and her claim and appeal were denied while she lived there." (D.E. 245 at 17.) Jaffe looks instead to Colorado for this contact because "the relationship between [Jaffe] and Prudential was formed there." (D.E. 252 at 25.)

At the time of the various alleged instances of bad faith, Jaffe resided in either New Hampshire or Vermont, and this contact points to either of those states to the extent that this contact, in the insurance context, focuses on the jurisdiction in which an insured may make a claim or from which an insured makes premium payments. But an insurance relationship is always grounded in a contract, and here that contract was negotiated, executed, and sold in Colorado. Specific language in Prudential's internal documentation in fact establishes that each policy it sells remains grounded in the regulations of the state of purchase: "[r]egardless of where the insured resided when the policy was purchased, or where he/she resides now, we have to utilize the contract they purchased. The contract is dictated by where they purchased the policy. This is referred to as the 'Contract State.'" (D.E. 253-49 at 2.) The "Contract State" of Jaffe's Policy is Colorado. (D.E. 253-50 at 2.). Although certainly not dispositive in a tort claim, this

language is probative and persuasive when considering where the relationship between the parties is centered. The record shows that Jaffe has lived in four different states during the course of her relationship with Prudential, but Colorado as the place of contracting and enduring "Contract State," remains the lodestar. Colorado, therefore, has at least as strong of a claim to be the center of the parties' relationship as does New Hampshire.

Having carefully considered Section 145, the Court is left with the conclusion that it proves minimally useful to the choice-of-law analysis in this case. The provision operates on the basic presumption that a tort results from a discrete act or omission—a car accident, property damage, the publishing of false and defamatory information, medical malpractice, and so on—that occurs in a readily identifiable time and space. *See, e.g.*, Restatement (Second) of Conflict of Laws § 145(2) cmt. (e) (relying on examples such as false imprisonment, defamation, and personal injury). The bad-faith breach of the covenant of good faith and fair dealing alleged here extends over years; the complaint asserts actionable conduct that can reasonably be located in several places. Potentially useful guidance though they may be, the Section 145 contacts are "considered . . . only to the extent that they are relevant to the purposes of the particular laws in conflict." *Fu*, 160 N.J. at 125 (quoting *White v. Smith*, 398 F. Supp. 130, 134 (D.N.J. 1975)). Here, an analysis under Section 145 demonstrates that no clear cluster of contacts exists. At best, Colorado as the contracting state hangs over the relationship regardless of where either party may reside at any given time, and any effort to identify a dominant contact by cabining the claim to the time period of alleged bad-faith conduct must fail because that conduct stretches across the border between Vermont and New Hampshire (bringing an indelibly Colorado contract along for the journey).

Finding few answers in Section 145, the Court turns now to a qualitative assessment of the Section 6 principles. These principles signal a clear preference for Colorado law.

The first factor is the interests of interstate comity, which "require courts to consider whether application of a competing state's law would frustrate the policies of other interested states." *Id.* at 122. "If a strong state policy or interest will neither be fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law." *Id.* at 122–23 (quoting *White*, 398 F. Supp. at 134); *Warriner v. Stanton*, 475 F.3d 497, 506 (3d Cir. 2007) (reaffirming *White v. Smith*).

Prudential reads this principle in favor of New Hampshire because that state "certainly has an interest in addressing the manner in which insurance companies treat its residents." (D.E. 245 at 18) (citing *Mobil Oil Corp. v. Durkin*, 111 N.H. 178, 182 (1971)). According to Prudential, this interest wins out because "Colorado's statutory scheme for regulating insurance companies is specifically concerned with Colorado residents." (*Id.*) Jaffe argues, "the interests of interstate comity favor Colorado, which has the more substantial regulatory interest as the situs of the contract." (D.E. 252 at 26.)

As a threshold matter, Prudential confuses the analysis of this common-law bad-faith claim with a related but distinct statutory scheme. Still, nothing in Colorado's statute limits its reach to policies held by present Colorado residents. Instead, the statute regulates policies "existing, offered, issued, delivered, or renewed in the state of Colorado," C.R.S. § 10-3-1116(8), a scope which encompasses Jaffe's LTC policy. Moreover, that Colorado has such a scheme in no way supersedes or abrogates the common-law tort. *See* C.R.S. § 10-3-1116(4) ("An action

authorized in this section is in addition to, and does not limit or affect, other actions available by statute or common law, now or in the future.").

This factor favors application of Colorado law, which has made a clear affirmative effort to protect insureds by recognizing a "special nature of the insurance contract." *Cary*, 68 P.3d at 466 (quoting *Trimble*, 691 P.2d at 1141). In the eyes of Colorado law, "[b]y obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity," which is a concern of such importance to Colorado law that its supreme court determined "[i]t is therefore necessary to impose a legal duty upon the insurer to deal with its insured in good faith." *Trimble*, 691 P.2d at 1141. Colorado calls this duty a "quasi-fiduciary relationship that exists between the insurer and the insured by virtue of the insurance contract." *Id.*; *Am. Mut. Fam. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004) (recognizing the "'quasi-fiduciary' relationship between the insurer and insured" in "the first-party context"); *but see Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996) (refusing to analogize and extend a breach of the quasi-fiduciary duty to a breach of fiduciary duty). Colorado also recognizes that "when an insured suffers a loss, the insured becomes 'particularly vulnerable' to the insurer." *Decker v. Browning-Ferris Indus. of Colo., Inc.*, 931 P.2d 436, 443 (Colo. 1997) (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273 (Colo. 1985)). The state's imposition of an implied covenant of good faith and fair dealing on insurance contracts in fact "arises from the heightened reliance necessarily placed by an insured on the insurer." *Id.*

New Hampshire law treats a first-party insurer's bad-faith refusal to pay as a form of bad-faith breach of contract rather than establishing a standalone tort. *See Jarvis*, 122 N.H. at 653–54. This indicates that New Hampshire treats the relationship between the insured and insurer as primarily contractual, recognizing no implied extra-contractual duties. It follows logically, then,

that an aggrieved insured would have no recourse to extra-contractual damages in tort. *See Bell*, 146 N.H. at 194.

The Court concludes the stronger state policy is Colorado's. Colorado has long put insurers that elect to do business within its borders on notice that the insured-insurer relationship is "special," establishing a clear duty beyond the terms of a commercial contract. Colorado, that is, makes efforts to curtail insurer abuse and malfeasance by alerting them to a state policy of heightened exposure to damages attached to contracts executed in its state. To permit an insurer to avoid that exposure simply because an insured elected to relocate would frustrate Colorado's policy efforts to limit bad faith.

The second Section 6 principle concerns the interests of the parties, which "require courts to focus on [the parties'] justified expectations and their needs for predictability of result." *Fu*, 160 N.J. at 123 (quoting *Pfizer, Inc. v. Emps. Ins. of Wausau*, 154 N.J. 187, 199 (1998)). According to the Restatement, this factor is "of extreme importance in the field of contracts" but "ordinarily plays little to no part in a choice-of-law question in the field of torts." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2) cmt. (b)). This distinction, however, relies on the common "unintentional injury" brand of tort such as negligence, presuming that unintentional tortfeasors act without advanced consideration of the law governing their actions. This factor gains greater importance for intentional torts, especially when the tort is incident to an insurance contract. *See Pfizer*, 154 N.J. at 199 (stating that parties' "justified expectation and their needs for predictability of result" are "basic purposes of contract law, especially insurance law").

Prudential adopts the Restatement's suggestion that this factor should play little role in the choice-of-law analysis but argues nonetheless that the factor points to New Hampshire. (D.E.

245 at 21.) Because the insurance company does business with individuals located around the country, Prudential suggests it should reasonably expect to be subject to the laws of the states where victims of its potential tortious conduct reside at the time of the tort. (*Id.*) Prudential again ignores the allegations of bad faith during Jaffe's Vermont residence. Jaffe says this factor favors Colorado law because "both parties expressly contemplated that Colorado law would govern" their relationship. (D.E. 252 at 26.)

Justified expectations find root in consistency. In the two-decades-plus relationship between Jaffe and Prudential, the only constant is that the Policy was negotiated, sold, and executed in Colorado, which remains what Prudential itself considers the "Contract State." (*Id.* at 23–24; D.E. 252-50 at 2.) Even if Prudential is correct that the residence of a tort victim establishes an expectation of applicable law, the facts here describe bad faith stretching from New Hampshire to Vermont. It is reasonable to conclude that the formation of the parties' relationship was accompanied by a justified expectation that Colorado law would govern the entirety of that relationship. At the very least, by registering to do an insurance business in Colorado, Prudential was on notice that it would be subject to the full breadth of that state's legal regime regulating the sale and administration of insurance policies. This factor therefore favors Colorado.

The third Section 6 principle concerns the interests underlying the field of tort law, which "require courts to consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law." *Fu*, 160 N.J. at 123. This principle instructs courts to determine whether deterrence or compensation is the rule's primary goal, but acknowledges, "[b]ecuase every tort rule, to some extent, is designed to

deter and to compensate, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to a specific rule." *Id.*

Prudential argues that this factor favors New Hampshire because "[t]he purpose of the tort of insurance bad faith is to deter an insurer's abuse of its unequal bargaining power against its insured and to compensate the insured," thereby making New Hampshire the natural choice as "the state where the harmful conduct took place." (D.E. 245 at 22) (citing *Am. Guar. & Liab. Ins. Co. v. King*, 97 P.3d 161, 168 (Colo. App. 2003); *Fu*, 160 N.J. at 123.) Jaffe argues that this factor favors application of Colorado law because "[a]pplying New Hampshire law, which does not recognize emotional distress damages in this context, would undermine Colorado's strong governmental interest in regulating insurance contracts issued within its borders and the conduct of insurers doing business in the State." (D.E. 252 at 26.)

This principle favors application of Colorado law because that state recognizes the tort of bad-faith breach of an insurance contract; New Hampshire does not. The Court need look no further for evidence of this distinction than Prudential's brief, which relies on *American Guarantee*—a Colorado case construing Colorado law—to identify the purpose of the tort, even as Prudential argues for application of New Hampshire law.

Indeed, Colorado is the clear choice under this factor because the state's law is committed to the full remedial breadth of tort law: "[a]n insured can recover damages for bad faith breach of insurance contract based on traditional tort principles. Compensatory damages for economic and non-economic losses are available to make the insured whole and, where appropriate, punitive damages are available to punish the insurer and deter wrongful conduct by other insurers." *Goodson*, 89 P.3d at 415 (citations omitted). As Prudential's citation of *American Guarantee*

underscores, Colorado law leverages the interests underlying the field of tort law to respond to the unequal bargaining power between insurer and insured.[12]

Conversely, as demonstrated above, New Hampshire does not recognize a tort for bad faith breach of an insurance contract, leaving a wronged insured to rely instead on contract remedies. Compensatory and consequential damages available under a theory of contract serve to compensate a victim of breach, but sophisticated contracting parties like insurance companies understand that an award of damages is a potential consequence of breach. Judicial enforcement of contract damages therefore serves no deterrent function in the style of tort remedies.

Because Colorado law serves the interests underlying the field of tort law to a greater extent than New Hampshire law, this factor favors application of Colorado law.

The fourth Section 6 factor focuses on the interests of judicial administration, which "require the courts to consider the relative ease in determination and application of the choice of law regarding a specific issue, a factor that in turn furthers the values of uniformity and predictability of result." *Fu*, 160 N.J. at 124. "In other words," this factor asks, "what choice of law works best to manage adjudication of the controversy before the court." *Pfizer*, 154 N.J. at 199. The Restatement treats this as the least important factor, which "must yield to a strong state interest implicated by the remaining factors." *Fu*, 160 N.J. at 124 (citing Restatement (Second) of Conflict of Laws § 145(2) cmt. (b)). Still, this factor recognizes that a court's "ease in the

[12] For these reasons, there is no merit to Prudential's argument that because Jaffe's appeal of her 2023 termination was successful and resulted in retroactive payments with interest and premium refunds she "has no damages and no legally cognizable claim in relation to the 2023 benefits termination and appeal." (D.E. 245 at 3 n.3.) In Colorado, restitution of contract damages is distinct from extracontractual tort damages: "[t]he basis for tort liability is the insurer's conduct in unreasonably refusing to pay a claim and failing to act in good faith, not the insured's ultimate financial liability. Therefore, the fact that an insurer eventually pays an insured's claims will not prevent the insured from filing suit against the insurer based on its conduct prior to the time of payment." *Goodson*, 89 P.3d at 414 (citing *Trimble*, 691 P.2d at 1142).

determination and application of the law to be applied" is beneficial to the court and the parties alike. *Id.* at 123.

Prudential's argument that this factor supports applying New Hampshire law mistakenly relies on the presumption found in Section 146 of the Restatement, which is not applicable here because it focusses solely on personal injury. (D.E. 245 at 22–23.) Jaffe argues that this factor weighs in favor of Colorado law because looking elsewhere opens the door to applying multiple bodies of law, including potentially New Hampshire, Vermont, New Jersey, Florida, and Pennsylvania. (D.E. 252 at 26.)

The interests of judicial administration are best served by applying Colorado law, which provides a specific tort remedy with clear factors and does not (like New Hampshire) require parsing distinctions between tort, contract, and administrative law. Favoring New Hampshire law would also complicate matters by opening the door at least to Vermont law.

The final Section 6 factor is the competing interests of the states, which asks "whether application of a competing state's law under the circumstances of the case 'will advance the policies that the law was intended to promote.'" *Fu*, 160 N.J. at 125 (quoting *Pfizer*, 154 N.J. at 198). The goal of this factor is to identify what right the legislature or court intended to protect and determine "whether those concerns will be furthered by applying that law to the multi-state situation." *Gen. Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 656 (3d Cir. 1995).

Prudential argues that this factor points to New Hampshire primarily because New Hampshire has "[p]resumptively" determined that higher damages awards against insurers would raise rates and elected to protect rates by stemming such awards. (D.E. 245 at 24.) For support of this position, Prudential cites only a single case decided in Illinois federal court more than 35 years ago. (*Id.*) (citing *York v. Globe Life & Accident Ins. Co.*, 734 F. Supp. 340, 343 (C.D. Ill.

1990)). Jaffe finds further support in this factor for application of Colorado law because applying New Hampshire law would thwart Colorado's interest in regulating insurance contracts. (D.E. 252 at 26.)

The insured's right that Colorado and New Hampshire courts each sought to protect in constructing a legal response to insurers' bad faith is the expectation of the insurer's good-faith dealings. So there is an overlap in this factor with the above discussion of interstate comity. Colorado has established a more comprehensive regime of protection for that right than New Hampshire has insofar as the latter structures remedies for bad faith within the field of contract law. Colorado's invocation of tort remedies to augment contract damages shows a broad response to bad-faith breach of an insurance contract that application of New Hampshire law would undermine. Colorado thus signals a greater interest in deterring the alleged bad faith in question and so this factor breaks in Colorado's favor.

In sum, the Section 6 factors point the Court to Colorado law, and Colorado law governs Count Four. Next, the Court must determine if Count Four survives Prudential's motion for summary judgment.

"For an insured to prevail on a first-party tortious bad faith breach of contract claim against the insurer, the insured must establish that the insurer acted: (1) unreasonably and (2) with knowledge of or reckless disregard of its unreasonableness." *Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 551 (Colo. 1997). (citations omitted). "[T]he tort of bad faith breach of an insurance contract encompasses an entire course of conduct and is cumulative." *Id.* (citations omitted). Courts evaluate the conduct of the insurer "objectively, based on industry standards." *Williams v. Owners Ins. Co.*, 621 F. App'x 914, 919 (10th Cir. 2015) (citing *Savio*, 706 P.2d at 1276).

Under Colorado law, a third-party insurance administrator may have a duty of good faith and fair dealing to an insured in the investigation and processing of an insurance claim, even absent privity of contract between the insured and the administrator. *Cary* 68 P.3d at 463–64. The *Cary* court held that the specific facts of the administrator's role and authority gave rise to a "special relationship" between the insured and the administrator and, accordingly, a duty in tort running from the administrator to the insured. Specifically, the administrator:

> had primary control over benefit determinations, assumed some of the insurance risk of loss, undertook many of the obligations and risks of an insurer, and had the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims. Under such circumstances, we hold that a special relationship existed between the administrators and the insured sufficient to establish in the administrator a duty to act in good faith.

*Id.* at 463.

A third-party administrator that simply carries out claims processing does not establish a special relationship with the insured. Its actions must be "similar enough to those typically performed by an insurance company in claim administration and disposition." *Id.* at 466. Specifically, the third-party administrator must "(1) perform the functions of an insurer *and* (2) have a financial incentive to limit an insured's claims . . . . [A]bsent a financial incentive to deny an insured's claims or coerce a reduced settlement, a third party that investigates and processes an insurance claim does not owe a duty of good faith and fair dealing to the insured." *Riccatone v. Colo. Choice Health Plans*, 315 P.3d 203, 207 (Colo. Ct. App. 2013); *see also Hertz Corp. v. Babayev*, 588 P.3d 682, 687 (Colo. 2026) (clarifying that *Cary*'s "modest holding" applies only "to a narrow class of third-party administrators" that "not only possess a significant financial stake in the resolution of claims but also have primary responsibility over claims handling on behalf of the ultimate insurer").

The elements a plaintiff must establish to succeed on a bad-faith claim against a third-party administrator are the same as against an insurer: the insured must show that "the administrators' conduct was unreasonable and the administrators knew their conduct was unreasonable or acted in reckless disregard of whether their conduct was unreasonable." *Cary*, 68 P.3d at 464.

Here, Jaffe pleads that Prudential acted unreasonably—and knew that it was doing so—by failing to evaluate facts of her inability to perform several ADLs objectively and in failing to communicate promptly and effectively with her. (SAC ¶¶ 164, 167.) In support, Jaffe points to evidence in the record that Prudential (1) restricted the proper scope of her in-home assessment (D.E. 252 at 3–4), provided vague justification for its denial of her 2018 benefits claim (*id.* at 4–5), delayed proper consideration of her appeal before denying it with cursory and insufficient justification (*id.* at 5–6), belatedly approved her claim only after being served with the present lawsuit (*id.* at 6), insisted on unnecessary annual reassessments (*id.* at 7), manipulated a medical assessment and terminated her claim in retaliation for this lawsuit (*id.* at 8–11), decided to terminate her benefits well in advance of medical examinations or assessment of other evidence in support of her claim (*id.* at 11–12), ignored the presence of supporting medical documentation (*id.* at 12), again unreasonably responded to her appeal in violation of corporate policies and standards (*id.* at 13–16), and incentivized the CHCS Defendants to prolong adjudication of her claim (*id.* at 16–18).

Throughout her briefing, Jaffe argues that evidence establishes the scienter element of her bad-faith claim by pointing to, *inter alia*, Prudential deviating from its own policies (*id.* at 35–36), willfully ignoring probative evidence (*id.* at 37), and establishing an appeal process designed to prolong rather than resolve disputes (*id.*).

Prudential offers responses to each of these points and in doing so, puts material facts in dispute. The Court's responsibility at this point of the litigation is to believe the evidence that Jaffe offers as the non-moving party. Doing so reveals triable issues of fact on Count Four and precludes the defendants' right to summary judgment.

As to the CHCS Defendants, specifically, Jaffe relies on record evidence to argue first that the third-party administrator had substantial control over the claim because it "made the operative eligibility determinations," which, according to Jaffe, "creates a triable issue regarding the CHCS Defendants' authority and control over claim outcomes." (D.E. 253 at 20.) Jaffe adds that the CHCS Defendants "performed core insurer-like functions" and points to record evidence suggesting that the CHCS Defendants "processed claims, issued explanation-of-benefits correspondence, directly administered appeals of denied claims, and provided Prudential with audits or reporting concerning claims handling." (*Id.* at 21–22.) Moreover, Jaffe argues that its agreement with Prudential provided incentives to the CHCS Defendants to "prioritize financial considerations over fair claim handling" and gave the CHCS Defendants "the opportunity to act unscrupulously within the meaning of *Cary*." (*Id.* at 22.) Regarding the compensation structure, Jaffe argues that "additional fees while claims remained unresolved and comparatively modest consequences for wrongful denials" demonstrate that the CHCS Defendants' compensation structure "rewarded delay and discouraged approvals." (*Id.* at 24.)

The Court finds that Jaffe has raised a triable issue as to (1) whether the CHCS Defendants have sufficient responsibilities over her claim to establish a special relationship with the insured and (2) whether the CHCS Defendants breached the duty of good faith and fair dealing incident to that relationship. A reasonable jury could conclude that the CHCS Defendants performed tasks functionally identical to an insurer in its investigation, analysis, and

processing of Jaffe's claim, and that it knew itself to be acting unreasonably by deliberately protracting its claim review in the interest of earning greater fees from Prudential during the pendency of a review without risking greater penalties by improperly approving a claim. The Court therefore denies the CHCS Defendants' motion for summary judgment on Count Four.

### C. Count Five: Unreasonable Delay or Denial of Insurance Claims by Prudential and the CHCS Defendants

In the complaint's fifth cause of action, Jaffe relies on the same set of facts as Count Four to claim that Prudential and the CHCS Defendants violated the Colorado statutory regime that establishes a private right of action for an insured to allege unreasonable delay or denial of benefits against an insurer. (SAC ¶¶ 170–73); C.R.S. §§ 10-3-1115 and 10-3-1116. Again, the Court must determine if an actual conflict between state laws exists and, if so, which state has the most significant relationship to the claim. *Curtiss-Wright Corp. v. Rodney Hunt Co.*, 1 F. Supp. 3d 277, 283 (D.N.J. 2014) (citing *Camp Jaycee*, 197 N.J. at 142–43).

As relevant to this case, Colorado law (1) prohibits an insurer from unreasonably delaying or denying payment of a claim for benefits owed to a first-party claimant, C.R.S. § 10-3-1115(1)(a); (2) creates a private right of action for an insured, *id.* § 10-3-1116(1); and (3) prescribes attorney fees, court costs, and two times the covered benefit as a remedy, *id.*

Unlike Colorado's statute, which broadly prohibits unreasonable delay or denial of payment of benefits, New Hampshire's statute identifies particular unfair claim-settlement practices, including unreasonable delays in communications or responses to claims, deficient investigation, failure timely to affirm or deny coverage, inadequate settlement practices, and knowingly underestimating claim value. New Hampshire Revised Statutes Annotated ("RSA") § 417:4, XV(a)(2)–(5), (9), (11), (14). The most prominent distinctions in the state's statutes,

however, lie in enforcement mechanisms and potential remedies. The New Hampshire statute empowers the state insurance commissioner to investigate and sanction insurers, and provides a private right of action for an insured only after the insurance commissioner has found a violation. *Id.* § 417:19, I; *Bell*, 146 N.H. at 193–94; *Hunt v. Golden Rule Ins. Co.*, 638 F.3d 83, 88 (1st Cir. 2011) ("Under RSA § 417:19, a consumer is 'permit[ted]' to file a private action for damages after the insurance commissioner finds a violation of the trade practices law") (alteration in original). The statute allows the insured "to recover any damages or loss suffered" because of the violation identified by the commissioner, but does not provide for fees, costs, or a multiplier, the way its Colorado counterpart does. RSA § 417:19, I.

A clear conflict of law exists. If Colorado law governs the claim, Jaffe may bring her claim directly against the defendants and demand fees, costs, and double the covered benefit. If New Hampshire law applies, Jaffe must first make a complaint to the insurance commissioner, await a potential finding of a violation, and, in the event of such a finding, may not recover twice the covered benefit.

As above, the second step of the choice-of-law analysis is determining which state has the most significant relationship to the claim. Because both provisions regulate the action of insurers incident to an insurance contract, the proper choice-of-law analysis takes guidance from Restatement (Second) of Conflict of Laws § 188(2), which, "[i]n the absence of an effective choice of law by the parties," provides a list (not unlike Section 145) of "the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue." These contacts are:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2); *Colony Ins. Co. v. Aspen Specialty Ins. Co.*, 564 F. Supp. 3d 343, 350 n.4 (D.N.J. 2021).

The first and second factors favor Colorado, where Jaffe negotiated, executed, and purchased her Prudential policy. *See* Restatement (Second) of Conflict of Laws § 188(2) cmt. (e) ("the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect").

The third factor, the place of performance, is divided among several jurisdictions. Jaffe paid premiums on the policy from Colorado for approximately six years, from California for the next eight years or so, from New Hampshire for about 4 years, and from Vermont starting in 2021. (D.E. 252 at 2); *see Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.*, 609 F.3d 223, 234 (3d Cir. 2010) (treating the place "where [the insured] paid the premiums" as the place of the insured's contract performance). The insurer "performs under the contract of insurance where it is required to" fulfill a promised benefit. *Specialty Surfaces*, 609 F.3d at 234. Here, Prudential has performed in New Hampshire, Vermont, and California. This factor does not favor any one state over another.

The fourth factor is similarly diffuse. The subject matter of the contract is Jaffe's need for in-home care without limitation to where her home may be at the time of her need. This is neither "land or a chattel" nor "protection against a localized risk." Restatement (Second) of Conflict of Laws § 188(2) cmt. (e). It is instead a promised benefit available regardless of Jaffe's location or situs at the time of the claim. After all, Prudential has already provided benefits under the Policy in at least three states. The Policy is best understood as providing "nationwide

coverage" to Jaffe, so "there is no identifiable location for the risk insured by the contract." *Specialty Surfaces*, 609 F.3d at 234.

The fifth factor in Section 188(2) substantially overlaps with the corresponding analysis under Section 145(2). *Compare* § 188(2) cmt. (e) ("These are all places of enduring relationship to the parties") *with* § 145(2) cmt. (e) ("These are all places of enduring relationship to the parties"). As above, therefore, because all that endures in this relationship is the Policy without regard to either party's location, this factor carries little weight.

In sum, the first and second factors are the only Section 188 contacts that clearly identify a single jurisdiction—Colorado—while the remaining three factors are geographically diffuse and provide little guidance.

"Finally, [the Court] 'must weigh these contacts on a qualitative scale according to their relation to the policies and interests underlying' the relevant issue on which there is a conflict," which is the alleged unreasonable delay or denial of claims. *Specialty Surfaces*, 609 F.3d at 234 (quoting *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)). Here again Section 6 provides guidance, and here again Section 6 points to Colorado.

In the field of contracts, the Supreme Court of New Jersey (taking guidance from the Third Circuit) "helpfully condensed" the Section 6 factors as applied to contract analysis to:

1. The competing interests of the states, which require courts to consider whether application of a competing state's law under the circumstances of the case will advance the policies that the law was intended to promote;
2. The interests of commerce among the states, which require courts to consider whether application of a competing state's law would frustrate the policies of other states;
3. The interests of the parties, which require courts to focus on their justified expectations and their needs for predictability of result; and
4. The interests of judicial administration, which require a court to consider whether the fair, just and timely disposition of controversies within the available resources of the courts will be fostered by the competing law chosen.

*Cont'l Ins. Co. v. Honeywell Int'l, Inc.*, 234 N.J. 23, 58, 55 (2018) (quoting *Pfizer*, 154 N.J. at 198–99) (cleaned up); *see also Gen. Ceramics*, 66 F.3d at 656 (grouping the seven Section 6(2) factors "into five different categories of interest," which *Pfizer* later condensed to the above four). Importantly, "the 'contacts' outlined in § 188 are relevant in order to 'assess[] what parties might reasonably have expected to be predictable.'" *Cont'l Ins. Co.*, 234 N.J. at 56 (quoting *Pfizer*, 154 N.J. at 199) (alteration in the original).

The first and second factors both demonstrate clear policy conflicts between the states. Colorado provides insureds a private right of action that New Hampshire withholds until after regimented administrative review, and Colorado's allocation of fees, costs, and a two-times multiplier is a more pronounced statutory remedy than New Hampshire's. To the extent that Colorado's statute reveals a policy of empowering private enforcement in the interest of greater insurer accountability to consumers, New Hampshire's regime tempers that response by interjecting a government actor and limiting recovery in such a way that dissuades litigation and lowers the potential risk of doing an insurance business in the state. Application of either statute will advance one state's interests and frustrate the polices of the other. The first two Section 6 factors therefore favor neither state.

The third and fourth factors, however, favor Colorado. When determining the justified expectations of the parties, "the contacts outlined in § 188 of the Restatement come to the fore. Courts look to the parties' justified expectations and the need for predictability, as well as the other contacts outlined in § 188." *Id.* at 60. Justified expectations "should be measured from [the parties'] vantage point at the time of contracting." *Pacific Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 438 (3d Cir. 2012). It is reasonable to conclude that parties entering into an insurance contract in Colorado would have recourse and be subject to

Colorado's statutory regime regulating insurance contracts. Certainly, insurance companies like Prudential doing business in the state are on notice of this exposure. It is far less reasonable to conclude that the parties expected at the time of contracting to be subject to the laws of some unnamed state wherever the insured happened to live when making a claim at some undetermined point in the future. Indeed, the Section 188 contacts are helpful here in that the only clarity that emerges from that analysis is the primacy of Colorado.

Finally, "the interests of judicial administration . . . asks 'what choice of law works best to manage adjudication of the controversy before the court.'" *Continental Ins. Co.*, 234 N.J. at 60–61 (quoting *Pfizer*, 154 N.J. at 199). As the parties demonstrate in their briefing by grouping Counts Four and Five under one section, managing the adjudication of the present controversy will be most efficient by applying the same governing law to the materially overlapping facts that are alleged in the two counts. This factor therefore favors Colorado.

The Court concludes that Colorado law governs Count Five.

On Count Five, Jaffe must proffer sufficient evidence to establish that her "claim for payment of benefits has been unreasonably delayed or denied," where *unreasonable* means "the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for the action." C.R.S. §§ 10-3-1116, 10-3-1115. Jaffe's Count Five statutory claim therefore overlaps with the common-law tort claim in Count Four, but the claims are not coextensive: "whereas a common law claim requires proof that the insurer acted unreasonably and that it knew or recklessly disregarded the fact that its conduct was unreasonable, 'the only element at issue in the statutory claim is whether an insurer denied benefits without a reasonable basis.'" *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 848 (Colo. 2018) (quoting *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012)); *see also Kisselman v. Am. Fam. Mut. Ins. Co.*, 292

P.3d 964, 974–75 (Colo. App. 2011) (noting that an insured's burden of proving a statutory claim is "less onerous" than the burden of proving scienter to support a common-law bad-faith claim).

Count Five survives summary judgment as against Prudential for the same reasons that Count Four survives: Jaffe has alleged that Prudential's initial examination of her, as well as its processing of her claim and appeals, were founded on unreasonable bases. Prudential disagrees, but the Court again treats Jaffe's claims as true for the purposes of summary judgment and leaves to a jury the task of adjudicating the merits.

Count Five likewise survives as against the CHCS Defendants. The *Riccatone* court recognized that although the statutory cause of action sought "to reduce the showing required under the common law standard . . . there is no indication that its purpose was either to expand or restrict the realm of possible defendants." 315 P.3d at 210. Consequently, "individuals or entities against whom a common law claim of bad faith breach of insurance contract would lie" satisfy Section 10-3-1116(1)'s definition of "a person engaged in the business of insurance." *Id.* Therefore, because Jaffe raised a triable issue sufficient to proceed against the CHCS Defendants under the common law, the CHCS Defendants may be held liable under the statute. As above, Jaffe has also raised a jury question as to whether the CHCS Defendants acted reasonably in their handling of her claim.

### D. Count Six: Violation of the Colorado Consumer Protection Act by Prudential

In her sixth cause of action, Jaffe alleges a violation of the CCPA by Prudential. Like the previous statutory claim, this count may survive summary judgment only if governed by Colorado law.

A true conflict exists between Colorado and New Hampshire. Both states have in place statutory regimes outlawing unfair and deceptive trade practices, *compare* C.R.S. § 6-1-105 *with*

RSA 358-A:2, but New Hampshire expressly carves insurance disputes out of its statue. *See* RSA 358-A:3, I ("The following transactions shall be exempt from the provisions of this chapter: Trade or commerce that is subject to the jurisdiction of . . . the insurance commissioner . . ."); *see Bell*, 146 N.H. at 194 ("We conclude that the regulation of the insurance industry is comprehensive and protects consumers from the same fraud and unfair practices as RSA chapter 358–A. We therefore hold that the insurance trade is exempt from the Consumer Protection Act pursuant to RSA 358-A:3, I.") (quotation omitted).

Because the alleged deceptive practice consists of representations or omissions in the marketing and sale of Prudential's Policy, the Court's choice-of-law analysis takes guidance from the Restatement (Second) of Conflict of Laws § 148, which contemplates the tort of fraud and misrepresentation. Section 148(1) provides that "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance upon the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties . . . ."

Count Six focuses on the marketing and sale of Jaffe's Policy, which occurred in Colorado. In the context of false advertising and similar misrepresentations, Jaffe's action in reliance is her purchase of the Policy in Colorado. On these facts, Section 148(1) presumptively selects Colorado law, unless another State has a more significant relationship to the particular issue. Here, no other state has a more significant relationship to the alleged marketing misrepresentations and Jaffe's purchase of the Policy. Section 148(1)'s presumption therefore holds; the Court need not undertake an analysis of jurisdictional contacts pursuant to Section 148(2), which like Sections 145(2) and 188(2) provides context for an analysis under Section 6.

In any case, an analysis under Section 148(2) would support the same finding under Section 6 as the Court made in the previous two sections. So, Colorado law governs.

To establish a private claim under the CCPA, a plaintiff must prove: "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

Prudential claims entitlement to summary judgment on Count Six by relying on Jaffe's deposition testimony, where, according to Prudential, she "confirmed that her claim is predicated solely on Prudential's alleged breaches of the insurance contract—that is, that Prudential made her promises in the policy that she thinks it failed to keep after she made a claim in 2018." (D.E. 245 at 35.) According to Prudential, this claim therefore runs afoul of Colorado caselaw establishing that "a 'breach of contract claim, without additional conduct, cannot constitute an actionable claim under the CCPA.'" (D.E. 245 at 34) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 (2003)). Prudential adds that Jaffe fails to satisfy the element requiring a showing of significant impact on the public. (D.E. 260 at 12–13.)

Jaffe suggests that Prudential's "argument rests on a fundamentally flawed understanding of both the statute and the record. (D.E. 252 at 41.) She points out, first, that the Colorado Supreme Court has held, "the CCPA applies to an insurer's post-sale or bad faith conduct and unfair claims handling practices." (*Id.*) (quoting *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 49 (2001)). Next, she suggests that her "claim is based on Prudential's course

of conduct spanning 2018 through 2024, not merely its actions during the narrower 2018–2019 period." (*Id.*)

The Court concludes that Jaffe has not established the significant public impact element that Colorado requires and, as a result, Count Six fails. "[T]o determine whether a challenged practice significantly impacts the public within the context of a CCPA claim" courts should consider "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings*, 62 P.3d at 149.

Jaffe pleads, "[u]pon information and belief, the conduct of Prudential that resulted in the unfair and deceptive trade practices described above significantly impacted the public as actual or potential consumers of Prudential's goods and services." (SAC ¶ 179.) Such an assertion might help this claim survive a motion to dismiss, but it is insufficient now. The record reflects no evidence of previous or potential impact of Prudential's alleged deceptive practices on other consumers. Instead, even if the CCPA claim is analytically distinct from Jaffe's breach of contract claim, the evidence supports only a private dispute between the parties.

The Court awards summary judgment to Prudential on Count Six.

### E. Count Seven: Civil Conspiracy between Prudential and the CHCS Defendants

In her seventh cause of action, Jaffe alleges a conspiracy between Prudential and the CHCS Defendants "to accomplish the unlawful goal of unjustly denying and then terminating the benefits due [Jaffe] under the policy." (SAC ¶ 185.)

Colorado and New Hampshire align on the elements of civil conspiracy, both requiring a showing of two or more persons agreeing to accomplish an unlawful end and causing damages. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995) (citation omitted); *In re Appeal of Armaganian*, 147 N.H. 158, 163 (2001) (quoting *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47 (1987)). The two states also agree that the predicate act of the conspiracy must be unlawful. *Nelson*, 908 P.2d at 106 ("[T]he purpose of the conspiracy must involve an unlawful act or unlawful means."); *Armaganian*, 147 N.H. at 162–63 ("[T]he gist of a civil action for conspiracy is not conspiracy as such, without more, but the damage caused by the act committed pursuant to the formed conspiracy," which must be "an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means"). On the surface, then, no conflict of law exists.

However, a conflict emerges on the facts of this case because Jaffe alleges that the goal of the conspiracy was an unjust denial of benefits. As demonstrated above, Colorado provides a private right of action in tort while New Hampshire prioritizes contract remedies and regulatory action. The states therefore differ on whether the alleged claim-handling conduct supplies an independently actionable tort or private statutory violation capable of serving as the unlawful-act predicate for civil conspiracy. A conflict therefore exists, but the Court has already determined that Colorado has the more significant relationship to this action in the context of tort. Colorado law therefore governs Count Seven.[13]

[13] Prudential and the CHCS Defendants both argue Count Seven under New Jersey law, apparently on the premise that no conflict exists in the law of civil conspiracy and therefore applying the law of the forum state. *See Rowe v. Hoffman-La Roche, Inc.*, 189 N.J. 615, 621 (2007) ("If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue.") Because a conflict exists, the Court proceeds to step two of the analysis and settles on Colorado law.

Prudential argues that the intracorporate conspiracy doctrine forecloses Jaffe's claim for civil conspiracy because the CHCS Defendants were Prudential's agent and "an agent who is doing the bidding of a principal is acting within the scope of its duty as directed by the principal and thus cannot be said to have 'conspired' by following the instructions of the principal." (D.E. 245 at 36–37.)[14] The CHCS Defendants add that Jaffe's complaint "does not identify anything approaching a specific agreement between the CHCS Defendants and Prudential to achieve a wrongful result" and, regardless, the CHCS Defendants' relationship with Prudential is "a standard third-party administrator relationship," not a conspiratorial meeting of the minds. (D.E. 247 at 26.) Jaffe challenges the applicability of the doctrine here because "Prudential, acting as principal, conspired with the CHCS Defendants, its agent, to carry out a claims-handling scheme that prioritized delay and denial over fair evaluation." (D.E. 252 at 44.) Jaffe adds that material facts support this claim, such as Prudential imposing limits on the functions of the CHCS Defendants' evaluator and Prudential structuring its agreement with the CHCS Defendants to incentivize prolonged claim review. (*Id.*)

The intracorporate conspiracy doctrine attacks the plurality element of civil conspiracy. Ordinarily, a corporation and its employees acting on its behalf do not qualify as "two or more separate persons" because "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017); *see also Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986) ("A corporation and its employees do not constitute the 'two or more persons' required for a civil conspiracy, at least if the employees are acting on behalf of the corporation and not as individuals for their individual advantage.") (citations omitted). Colorado courts do

[14] Prudential also argues that this claim must fail because Jaffe "has not alleged any viable tort claim against Prudential." (D.E. 245 at 38.) Because Count Four has survived summary judgment, this argument has no merit.

not appear to have decided whether the intracorporate conspiracy doctrine extends to a principal-agent relationship between legally distinct entities such as Prudential and the CHCS Defendants.

Certain federal courts, however, including the Tenth Circuit applying Kansas law, have recognized the so-called "personal-stake exception" whereby "officers, directors, or employees of a corporation who personally benefit from the illegal activities in a way separate and distinct from the corporation may be held to be a participant in a conspiracy with their corporation." *Wegerer v. First Commodity Corp. of Bos.*, 744 F.2d 719, 725 (10th Cir. 1984). Application of this exception in other jurisdictions suggests that a civil conspiracy claim will lie among intracorporate actors where the plaintiff has shown that the agent has a sufficiently independent personal stake in achieving the illegal objective of the alleged conspiracy. *See, e.g.*, *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) (recognizing the exception and its limitation to situations "where a co-conspirator possesses a personal stake independent of his relationship to the corporation"); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 956 (11th Cir. 1986) (denying a motion to dismiss so that the plaintiff could be given the opportunity to show "an 'independent personal stake' in the outcome of the conspiracy" between separate entities). The *Pittman* court's qualifier to the intracorporate conspiracy doctrine (". . . at least if the employees are acting on behalf of the corporation and not as individuals for their individual advantage"), 724 P.2d at 1390, suggests that Colorado courts do not apply a de facto intracorporate immunity to the principal-agent relationship but instead require that the alleged conspirators are unified in working toward the same corporate ends.

The operative question, therefore, seems to be whether the alleged coconspirator whom the defendant claims to be an agent has a personal stake in the alleged conspiracy that is independent of the corporation's interests. Here, Prudential and the CHCS Defendants

characterize their relationship as entirely aligned, whereby the CHCS Defendants merely execute Prudential's directives. (D.E. 245 at 36–38; D.E. 247 at 26.) Jaffe disagrees, arguing that the CHCS Defendants have a personal stake in the alleged conspiracy because "Prudential structured its [Master Services Agreement] with [the] CHCS [Defendants] in a manner that incentivized prolonged claim review and, ultimately, claim denials." (D.E. 252 at 44.) Jaffe argues that the operating agreements between the two entities "created financial incentives for [the] CHCS [Defendants] to prolong claim adjudication, because [the] CHCS [Defendants] earned additional fees for each month a long-term care claim remained under review." (D.E. 253 at 15.) "The object of the conspiracy was straightforward," argues Jaffe: "to maximize profitability by delaying, minimizing, or denying expensive long-term care claims such as [Jaffe's]." (*Id.* at 26.) Prudential brushes this argument aside by suggesting it "ignores the reality that there is more work for [the] CHCS [Defendants] when a claim is under review, and *that Prudential is the one paying [the] CHCS [Defendants]*. Of course, there is no legitimate reason Prudential would want to pay more money in connection with a claim review." (D.E. 260 at 13) (original emphasis).

The Court finds that a reasonable jury could conclude that Prudential and the CHCS Defendants as two distinct entities conspired to delay and deny Jaffe's claim. Regardless of the fact that Prudential pays the CHCS Defendants during the claim-review process, such an expense is certainly less costly to Prudential than paying out a LTC policy. This is one apparent reason why Prudential would want to pay more money in connection with a claim review. Thus, to whatever extent Prudential and the CHCS Defendants exist in a principal-agent relationship, Jaffe has proffered sufficient material evidence to raise a jury question regarding the CHCS

Defendants' stake in obtaining increased fees in prolonged review and reduced exposure to potential penalties from Prudential by denying rather than approving claims.

The continued viability of Counts Four and Five beyond summary judgment is sufficient to satisfy the requirement that the predicate act of the alleged conspiracy be unlawful: by statute and at common law, Colorado law renders the unreasonable delay or denial of covered benefits unlawful.

Count Seven therefore survives summary judgment.

## VI. Conclusion

For the foregoing reasons, Prudential's motion for partial summary judgment is granted in part and denied in part. Prudential is awarded summary judgment as to Count Three's requests for declarations regarding (1) facts after January 2, 2021, and (2) Jaffe's ability to return to this Court for further relief, and as to Count Six. The CHCS Defendants' motion for summary judgment is denied in full. An appropriate Order to this effect will be entered.

Dated: September 30, 2026

/s Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.